UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| DAVID W. NAIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:06-CV-292 PS |
| | ) | |
| J. C. GUTIERREZ, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

David Nail, a *pro se* plaintiff, filed this action under Section 1983 against Fort Wayne Police Officers J.C. Gutierrez and Josef Cutler alleging violations of his Fourth Amendment rights. Nail's claims arise from the officers' investigation of a 911 hangup call made by his (now former) wife Pamela Olmstead on October 1, 2004. He alleges that during their investigation of the 911 hangup, Gutierrez and Cutler conducted unreasonable searches and seizures and used excessive force while trying to arrest him. Nail also sues Fort Wayne Police Chief Rusty York alleging that the Fort Wayne Police Department failed to adequately train the officers in 911 responses, domestic disturbances and use of force. This matter is now before the Court on cross-motions for summary judgment. [DE 110; DE 166]. For the following reasons, summary judgment is granted on all claims in favor of Defendants and against Nail.

## FACTUAL BACKGROUND

On the evening of October 1, 2004, Officers Gutierrez and Cutler were dispatched to Nail's residence to investigate a 911 hangup originating from that location. (DE 167-2, Gutierrez Aff. ¶ 2; DE 167-3, Cutler Aff. ¶ 2.) After the officers arrived at the residence and knocked on the door, Nail appeared. (DE 183-2, Nail Dep. at 19.) The officers informed Nail that someone at

1

his residence dialed 911 and then hung up. (*Id.*) Nail responded that his wife Pamela had misdialed the phone while trying to get directory information. (*Id.*) The officers sensibly asked to speak with Pamela herself to verify Nail's story. (*Id.* at 20.) Nail then left the front door and told Pamela, "You are going to have to talk to [the police]. They want to see you." (*Id.*) Some time passed, and neither Pamela nor Nail appeared. (Gutierrez Aff. ¶ 3-4; Cutler Aff. ¶ 3-4.) (*Id.*) Concerned about Pamela's safety, or that Nail had fled, Officer Gutierrez walked around the residence, through a latched gate, and into Nail's backyard. (Nail Dep. at 22.) Officer Cutler remained on the front porch. (*Id.* at 21, 24.)

When Gutierrez entered Nail's backyard, he found Nail sitting on his back porch. (*Id.* at 20.) Gutierrez attempted to question Nail about what occurred that evening, but Nail refused to answer and repeatedly asked why Gutierrez was there. (*Id.* at 22-23.) At some point, Nail got up and said he was going back into the house to get a cigarette. (*Id.* at 23.) Gutierrez told Nail that he was not going anywhere and pushed him back into his chair. (*Id.* at 23-24.) The exchange between Nail and Gutierrez became heated. (*Id.*) By Nail's own admission, he was raising his voice and protesting Gutierrez's instructions. (*Id.* at 25-26.) Officer Cutler then arrived on the back porch. (*Id.* at 25.) Both officers testified that Nail's breath smelled of alcohol. (Gutierrez Aff. ¶ 3-4; Cutler Aff. ¶ 3-4.) Nail himself confirmed that he had been drinking that night. (Nail Dep. at 15.)

Around the same time that Cutler arrived on the back porch, Pamela came out the back door, and Officer Cutler asked if everything was alright. (*Id.* at 26.) Pamela responded by asking Nail aloud, "Well is it, David?" (*Id.* at 27.) At that point, Pamela told the officers that Nail had slapped her on the face earlier that evening. (DE 167-8, Olmstead Dep. at 23.) Nail admits that he had in fact hit his wife. (Nail Dep. at 16-17.) Cutler then took Pamela back into the house to

2

speak with her. (*Id.* at 27.)

Meanwhile, Gutierrez continued to question Nail about what happened that night. (*Id.* at 30.) Nail made several more attempts to leave his chair and Gutierrez continued to push Nail back down. (*Id.* at 31.) After several failed attempts to leave, Nail asked if he was under arrest and Gutierrez warned Nail that he would be handcuffed if he got up again. (*Id.*) Cutler and Pamela then returned from inside the house and Cutler informed Nail he was under arrest for domestic battery. (*Id.* at 32.)

Fed up with Gutierrez's shoving, Nail suddenly got up and tried to push Gutierrez back. (*Id.* at 33.) Nail missed Gutierrez and lunged towards Cutler. (*Id.* at 34.) A scuffle ensued between Nail and the officers. (*Id.* at 34-36.) Nail admits that he resisted the officers' attempts to subdue him by trying to hold the officers on the ground while they tried to handcuff him. (*Id.* at 35.) During his deposition, Nail said he did not recall the details of the scuffle and testified that "I don't know who was doing what." (*Id.* at 35.) He did state that the officers "forcibly took me to the ground and held me down on my stomach while they were beating me about my head, shoulders, face and groin while spraying pepper spray in my eyes." (DE 183, Nail Mem. at 7.) He also recalled that Cutler struck him with a baton. (*Id.* at 35.)

The officers' version of the scuffle did not contradict Nail's but did provide more detail. Cutler admits he applied a stun strike to Nail's face because Nail was resisting the officers' efforts to place him in cuffs. (Cutler Aff. ¶ 7.) When Nail continued to resist the officers, they administered two bursts of pepper spray to Nail's face. (Gutierrez Aff. ¶ 6.) That did not work, so they applied three strikes to Nail's thigh in order to handcuff him. (*Id.* ¶ 8.)

Once Nail was handcuffed, one of the officers gave Nail some water for his eyes. (Nail Dep. at 38.) Nail does not report any further use of force by the officers after this point. (*Id.* at

3

36.) Because pepper spray was used, the officers took Nail to a nearby hospital where he was treated for chemical exposure to his eye. (*Id*. at 39.) He also alleges that he suffered bruises along his back and thighs, but does not indicate that he was treated for these injuries. (*Id.* at 35.) He was then cleared by the hospital medical personnel and taken to lock-up where he was booked on charges of domestic battery and physically resisting law enforcement. (*Id.*; Cutler Aff. ¶ 11.) At the jail, he took a breathalyzer test which registered a 0.12 blood alcohol level. (DE 167-10.)

On October 4, 2004, Nail pled guilty to both domestic battery and resisting law enforcement charges. (DE 167-11 at 1-2.) He was sentenced to one year in Allen County Jail, suspended, and one year of unsupervised probation. (*Id.*)

Nail then filed this lawsuit against Cutler, Gutierrez, and Fort Wayne Police Chief Rusty York. He alleges Gutierrez and Cutler violated his Fourth Amendment rights by trespassing on his property, physically restraining him and using excessive force against him. Nail further asserts that York is liable for failure to train the officers or provide proper procedures for 911 responses, domestic disturbances or use of force. Both parties seek summary judgment.

## DISCUSSION

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Substantive law determines which facts are material; that is, which facts might affect the outcome of the case. *Id.* A party opposing a properly supported summary judgment motion may not rest upon the mere

4

allegations or denials of the adverse party's pleading but rather must introduce affidavits or other evidence to set forth specific facts showing that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *see also Anders v. Waste Mgmt. of Wisc.*, 463 F.3d 670, 675 (7th Cir. 2006.) To determine whether a genuine issue of material fact exists, the Court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255. "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make a choice of inferences." *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999). Moreover, in deciding a summary judgment motion, the Court cannot decide the credibility of witnesses or weigh the evidence. *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

Section 1983 creates a federal cause of action for "the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must allege: (1) that the defendant has deprived him of a federal right, and (2) the defendant did so acting under color of state law. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006). Nail asserts that the officers deprived him of his rights under the Fourth Amendment in three ways: by entering his property without a warrant; by using physical restraint in making him sit in the chair on the back porch; and by using excessive force in arresting him.

**A.      Warrantless Entry**

The Fourth Amendment generally requires police to have a warrant to enter a home. But warrantless searches are permissible where there is probable cause and exigent circumstances. *United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006). Probable cause is a probability or substantial chance of criminal activity, not a certainty that a crime was committed. *Illinois v.*

5

*Gates*, 462 U.S. 213, 244 n.13 (1983); *United States v. Watzman*, 486 F .3d 1004, 1008 (7th Cir. 2007). Whether probable cause exists is a practical common sense determination based on the totality of the circumstances and viewed through the eyes of an objectively reasonable officer. *United States v. Ellis*, 499 U.S. 686, 689 (7th Cir. 2007). Exigent circumstances exist if an officer had an objectively reasonable belief that there was a compelling need to act and no time to obtain a warrant. *United States v. Bell*, 500 F.3d 609, 613 (7th Cir. 2007). Reasonable fear for the safety of someone inside the premises qualifies as an exigent circumstance that would justify a warrantless entry into a home. *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003)

Dialing 911 is a common way to convey to the police that there is an emergency at hand. As the Seventh Circuit has noted:

> A 911 call is one of the most common–and universally recognized–means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help. This fits neatly with a central purpose of the exigent circumstances (or emergency) exception to the warrant requirement, namely, to ensure that the police or other government agents are able to assist persons in danger or otherwise in need of assistance.

*United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000). Anonymous 911 hangup calls often present an even higher need for police investigation. "Many 911 calls are brief, and anonymous, precisely because the speaker is at risk and must conceal the call. These persons are more rather than less in need of assistance." *United States v. Elder*, 466 F.3d 1090, 1091 (7th Cir. 2006). Therefore, the fact that an anonymous 911 hangup was received from Nail's residence more than justified entry onto his property for purposes of investigation. It is true, as Nail contends, that the 911 call could have been as benign as a child playing with the phone. But that possibility is not enough to quell the reasonable fear that an officer might have for occupants of the residence.

Next, Nail asserts that the officers violated his Fourth Amendment rights by entering his

gated backyard. The Fourth Amendment's protection from unreasonable searches and seizures extends to the enclosed perimeter of the home (the so-called "curtilage"). *Bleavins v. Bartels*, 422 F.3d 445, 450-51 (7th Cir. 2005). Here, probable cause and exigent circumstances existed to justify the officers' warrantless entry into the gated area of Nail's yard. When Nail answered the door, he told the officers that his wife Pamela mistakenly dialed 911 while trying to dial directory assistance. Any reasonably prudent officer would have looked askance at that claim and sought to investigate further by speaking with the caller to confirm that she had in fact made a mistake and was safe and secure. That's just what the officers did. But after Nail left the front door, several minutes passed and she did not show. This only heightened the officers' concern. Pamela's absence ripened the situation into probable cause. Given the emergency nature of 911 calls, and the fact that the caller was missing, exigent circumstances existed for the officers to enter Nail's backyard to try and locate Pamela and ensure her safety. *Elder*, 466 F.3d at 1091 (reasoning that considerations of a 911 caller's safety "make a look-see prudent"); *see also United States v. Brown*, 64 F.3d 1083, 1086 ("We do not think that the police must stand outside a [residence], despite legitimate concerns about the welfare of the occupant, unless they hear screams."). Therefore, the officers' warrantless searches of Nail's property did not exceed their permissible limits under the Fourth Amendment.

**B.     Physical Restraint**

Nail also alleges that he was forcibly detained without probable cause when Gutierrez repeatedly shoved Nail and kept him in his seat before knowing that a domestic violence incident occurred. A seizure under the Fourth Amendment occurs whenever a police officer "by means of physical force or show of authority . . . in some way restrain[s] the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("Whenever

7

an officer restrains the freedom of a person to walk away, he has seized that person."). A *Terry* seizure is permissible when there is a reasonable suspicion that criminal activity is afoot. *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). While "reasonable suspicion" is hard to define precisely, the Seventh Circuit has held that it is less than probable cause and more than a hunch. *Id.* "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Id.*

Here, Gutierrez had more than adequate suspicion to briefly restrain Nail during the investigation. A 911 hangup had originated from Nail's house. When the officers ordered Nail to bring the caller to the door, she never showed. Instead, the officers found him in the backyard. From then on, his behavior was uncooperative, confrontational and evasive and he made several attempts to flee back into the house. In addition, he was notably drunk–a fact confirmed by his 0.12 blood-alcohol level detected hours later. Under these circumstances, Gutierrez's physical restraint of Nail was a permissible seizure under *Terry*.

**C.     Excessive Force**

Nail next alleges that Gutierrez and Cutler used excessive force while trying to arrest him. Under *Terry* and its progeny, "[t]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The reasonableness standard is not capable of precise definition or mechanical application, but "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses a threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight." *Id.*

8

Here, there are not conflicting versions of what happened during the scuffle – the officers simply give more detail of the account. According to the officers, they used different levels of force to try and subdue Nail including a strike to the face, pepper spray and several strikes to the thigh. Nail himself does not recall the details regarding the scuffle and thus cannot refute the officers' version of events. Instead, he states that the officers "forcibly took me to the ground and held me down on my stomach while they were beating me about my head, shoulders, face and groin while spraying pepper spray in my eyes." (DE 183, Nail Mem. at 7.) Thus, there is not a material difference between the two sides of the story with respect to the number, severity and/or method of strikes administered by the officers.

But viewing the facts in the light most favorable to Nail, no reasonable fact-finder could conclude that the officers' use of force was excessive under the circumstances. It cannot reasonably be disputed that Nail posed a threat to the officers' safety. By Nail's own admissions, he was drunk, confrontational, and raised his voice at the officers. The officers were also on notice that Nail had a proclivity for violence, given that he had hit his wife earlier that evening. And Nail readily admits that he lunged towards Cutler and tried to shove Gutierrez. Under these circumstances, Cutler's responsive strike to Nail's face was objectively reasonable. *See Prymer v. Ogden*, 29 F.3d 1208, 1216 (7th Cir. 1994) (finding reasonable an officer's strike to an arrestee's face to avoid being spat on).

From there, the situation rapidly deteriorated. According to Nail, the officers took him to ground, where they applied pepper spray and continued to strike him. Nail could have avoided this altercation by peaceably submitting to arrest. But he did not. Instead, he admits that he physically resisted the officers' attempts to subdue him by trying to forcibly pin the officers down. The Supreme Court has noted that "[t]he calculus of reasonableness must embody allowance for

the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. In light of the officers' need to regain control of the situation, and protect their own safety, their use of force under these circumstances was not excessive. *See Prymer*, 29 F.3d at 1210 (kneeling on arrestee's back and several kicks to the ribs found objectively reasonable where arrestee resisted arrest and tried to strike officers); *Duran v. Sirgedas*, 240 Fed. Appx. 104, 117 (7th Cir. 2007) (no excessive force where officer struck suspect in the leg with a baton and punched him in the head with a closed fist, where suspect struggled with officers and bit one of them).

It is also important that, once Nail was handcuffed, the officers' stopped using force. This is not a case where the officers' beat up an arrestee after he no longer posed a threat. The fact that the officers' limited their use of force to the needs of the situation further supports the reasonableness of their actions.

Moreover, Nail offers no evidence to create an inference that the degree of force used was excessive. The extent of an injury caused by the use of force is a relevant, but not dispositive, factor in determining whether the use of force is excessive. *See Chelios v. Heavener*, 520 F.3d 678, 690 (7th Cir. 2008). Here, Nail asserts that he suffered bruises along his back and thighs. But he offers no evidence or medical records as to the severity of those injuries. The record indicates that the officers took him to a hospital where he was treated for chemical exposure from the pepper spray and then cleared to leave. There is no suggestion that he was treated for any of his injuries, which creates an inference that the injuries were not severe. Without more, a jury could not infer that the degree of force applied by the officers was excessive.

Therefore, the officers' use of repeated strikes and pepper spray under the above

circumstances was neither gratuitous nor excessive.

**D.    Failure To Train**

Finally, Nail alleges that Police Chief York is liable in his official capacity for failure to train Fort Wayne police officers on a variety of police procedures. An official capacity suit against a police officer is a suit against the municipality itself. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). A police department may be liable for the inadequacy of police training if the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact. *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (citing *Canton v. Harris*, 489 U.S. 378, 388 (1989)). However, where there has been no violation of the plaintiff's constitutional rights, there can be no liability under the failure to train theory. *Jenkins v. Bartlett*, 487 F.3d 482, 488 (7th Cir. 2007). As explained above, Nail cannot survive summary judgment on this Fourth Amendment claims against Cutler and Gutierrez. Therefore, his failure to train claim necessarily fails as well.

Even if that were not the case, Nail cannot establish deliberate indifference by the Fort Wayne Police Department in the training of its officers. Deliberate indifference can be demonstrated in two ways. The plaintiff must either show: (a) failure to provide adequate training in light of foreseeable consequences, or (b) failure to act in response to repeated complaints of constitutional violations by its officers. *Sorberger v. City of Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006). Here, Nail maintains that the department's training and policies regarding 911 hangups, domestic disturbance cases, and police brutality is inadequate. He relies solely on inadmissible secondhand accounts from other officers that he has spoken with in the past and recollection of research he had done in college. But he has not offered anything concrete to suggest that the officers' training is any way deficient. On the other hand, the officers have

indicated that they received training in these areas and submitted the written policies used by the department in these areas. (Cutler Aff. ¶ 14; Gutierrez Aff. ¶ 12; DE 167-3 at 8-21.) Moreover, Nail offers no evidence that the police department failed to act in response to repeated complaints of police abuse. Accordingly, no reasonable juror could find for Nail on his failure to train claim.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment [DE 110] and **GRANTS** Defendants' Motion for Summary Judgment [DE 166]. All other pending motions are **DENIED AS MOOT**. The Court **DIRECTS** the Clerk of the Court to **ENTER JUDGMENT** in favor of Defendants and against Plaintiff.

**SO ORDERED**.

**ENTERED**: October 10, 2008.

                                        s/ Philip P. Simon
                                        PHILIP P. SIMON, JUDGE
                                        UNITED STATES DISTRICT COURT